**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER CANTU, as the** | ) | |
| **Administrator of the Estate of** | ) | |
| **Robert Earl Lawrence,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16-cv-1003-MHT-DAB** |
| | ) | |
| **CITY OF DOTHAN, ALABAMA,** | ) | |
| *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, Christopher Cantu, as Administrator of the Estate of Robert Earl Lawrence, alleges constitutional violations due to the use of excessive force and state law claims of assault and battery against Defendants, City of Dothan, Alabama; Greg Benton, Chris Summerlin, and Adrienne Woodruff, arising out of the fatal shooting of Robert Earl Lawrence.  (Doc. 28).

Before the Court are the parties' cross motions for summary judgment: Plaintiff's Motion for Partial Summary Judgment and Brief in Support (Doc. 43) and Defendants' City of Dothan, Alabama, Benton, Summerlin, and Woodruff's Motion for Summary Judgment (Doc. 63).  The parties have been afforded an opportunity to fully brief the matters, and the court heard argument on January 25 and May 24, 2018.  For the reasons stated herein, it is the **RECOMMENDATION** of the

undersigned that the Plaintiff's Motion for Partial Summary Judgment (Doc. 43) be **denied**; and Defendants' Motion for Summary Judgment (Doc. 63) be **granted in part** and **denied in part** as set forth below.

## I.  JURISDICTION

Subject matter jurisdiction is conferred by 28 U.S.C. § 1343(a)(3) as to Plaintiff's § 1983 federal cause of action, and the court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).  The parties do not contest personal jurisdiction or venue, and the court finds sufficient information of record to support both.  *See* 28 U.S.C. § 1391.  On January 3, 2017, this matter was referred to the undersigned by the Honorable Myron H. Thompson for disposition or recommendation on all pretrial matters. (Doc. 4); *see also* 28 U.S.C. § 636(b); Rule 72, Fed. R. Civ. P.; *United States v. Raddatz,* 447 U.S. 667 (1980); *Jeffrey S. v. State Bd. of Educ. of State of Georgia,* 896 F.2d 507 (11th Cir. 1990).

## II.  STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for

2

summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc*., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co*., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250–51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1263 (quoting *Anderson*, 477 U.S. at 251–52).

## III.   PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Christopher Cantu is the personal representative of the Estate of Robert Earl Lawrence who was fatally shot by Defendant Adrianne Woodruff, a Dothan Police Department sergeant. (Doc. 29 at 1–3). The parties agree the facts

3

are mostly undisputed as the shooting and the events leading up to it are captured on multiple video and/or audio recordings.[1]  (Docs. 43 at 7; 64 at 10; 70 at 9, 12).  The first is the closed circuit camera recording (without sound) inside the office of the Dothan County Animal Shelter.  The second and third video recordings are from Lawrence's girlfriend, Priscilla Grissett's cell phone camera.  The fourth video is from Officer Alan Rhodes' dash-mounted camera.  There are also audio recordings of three telephone calls from the animal shelter to Dothan Police dispatch.  *See* Docs. 43 at 7; 64 at 10.

The incident began when Lawrence tried to turn a dog in at the Dothan Animal Shelter.  (Doc. 69-3 at 74).  Midday on December 30, 2014, Lawrence entered the Dothan County Animal Shelter reception area with a dog he wanted to drop off.  (Docs. 65, ¶ 9; 64-25).[2]  Woodruff was the sergeant on duty assigned to supervise the animal shelter.  (Doc. 64-1 at 3).  Receptionist Patricia Holley and Chief Animal Services Officer Renee Skipper were also working at the shelter that day.  *Id.* at 3–4.  Lawrence told Holley he was from Geneva County, and she advised that they only take dogs from Houston County.  *Id.* at 3.  Lawrence told her he found the dog

---

[1] Of course, audio and video recordings, however instructive, are often not definitive. Cameras and microphones are subject to many limitations, *e.g.,* duration, angles and perspectives, quality and clarity, synchronicity, framing. In addition, some potentially legally significant items, such as purpose, motive and intent, intensity of action and dissimulation, generally are not apparent in recordings.

[2] Defendants cite to the animal shelter video to support this fact.  Plaintiff does not dispute it.  *See* Doc. 70 at 12.

at a Dothan Wal-Mart. *Id.*  Woodruff came in from the adjoining office when she heard Lawrence getting upset about being asked for identification.  *Id.*  Lawrence refused to produce identification, citing federal law and claiming invasion of privacy. *Id.* Woodruff agreed to take the dog without his producing identification as long as he would sign a routine intake form.  *Id.*  Lawrence refused to sign the form and threatened to dump the dog at the end of the road.  *Id.*  Woodruff told him that would be a crime.  *Id.*  In her deposition, Woodruff acknowledged that Lawrence's threat to dump the dog at some point in the future was not a basis to arrest him.  (Doc. 69-3 at 77).  Lawrence complained his rights were being violated, and he picked the dog up to leave. (Doc. 64-1 at 3). Woodruff asked him for identification, which Lawrence again refused, stating it was a violation of his rights.  *Id.*

Skipper testified that people threaten to leave a dog off at the road two to three times per month.  (Doc. 69-7 at 32).  When such a threat is made, the procedure is to go out and write down the tag number of the person's vehicle in the event the dog is later found.  *Id.* at 32–34.

As Lawrence was leaving the shelter with the dog, Woodruff followed him with the intention to write down the tag number of Lawrence's vehicle.  (Doc. 69-4 at 228).  As Woodruff followed Lawrence, she observed a holster on his hip.  *Id.* She asked Lawrence about the gun, and he told her it was in his car.  *Id.*  Woodruff asked her assistant to call for back-up.  (Doc. 69-3 at 65).

Lawrence walked toward his car and called out to his girlfriend in the car: "Get the video. This is going to be a good one." *Id.* at 64; Doc. 69-4 at 230. Lawrence sat in the driver's seat of the car which was still running. (Doc. 69-3 at 66, 68; Doc. 69-4 at 229). Woodruff thought he was intending to leave, but he was getting his "affidavit of identity". (Doc. 69-4 at 241). Woodruff went to the rear of the vehicle to copy the tag number, but Lawrence got out of his car and attempted to block her view of the tag; she ultimately got the tag number. (Doc. 69-3 at 68–71).[3] Woodruff called police dispatch to request her back-up. (Doc. 69-4 at 234–35). Lawrence told Woodruff he was leaving, but she told Lawrence he could not leave without showing her a driver's license. *Id.* at 237. Lawrence produced a piece of paper titled an "AFFIDAVIT OF IDENTITY." *Id.* at 241. *See* Doc. 48-2. The document, "duly affirmed upon oath and full commercial liability" Lawrence's name, his "current post" and "Date of origin." (Doc. 48-2). The Affidavit purported to be proof of his description, picture, right thumb print, and signature. *Id.* Based on her training, Woodruff believed Lawrence to be a Sovereign Citizen.[4] (Doc. 64-1 at 3–4; Doc. 70, ¶ 20).

---

[3] Woodruff also testified that she could not communicate the tag number initially to dispatch because she could not get through on the telephone. (Doc. 69-4 at 233–36).

[4] "The sovereign citizens are a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior." *United States v. Ulloa*, 511 F. App'x 105, 107, n.1 (2d Cir. 2013). The hallmark of the sovereign citizen movement is the belief that even though an individual was born and resides in the United States, he is his own sovereign and is therefore not a United States citizen. *Gravatt v. United States,* 100 Fed. Cl. 279, 282 (2011). The Eleventh Circuit has noted that individuals who refer to themselves as "sovereign citizens" believe they are not subject to the jurisdiction of the

6

Lawrence demanded his identification paper back. (Doc. 48-6; Grissett video). Woodruff said she would first call police dispatch to request a warrant check for Lawrence. *Id.* Lawrence told Woodruff that she had no right or authority. *Id.* Lawrence requested his paperwork back several times, but Woodruff refused. (Doc. 69-3 at 87). Skipper brought Woodruff a portable telephone, and Woodruff called to verify there were no warrants for Lawrence. (Doc. 48-6). The warrant check was negative. (Doc. 70, ¶¶ 15, 17; Doc. 64-31). After confirming there were no warrants, Woodruff stayed on the call with dispatch and the exchange between Lawrence and Woodruff was recorded. (Doc. 64-31). After Woodruff ran the tag for his vehicle, the tag came back registered to a silver Lexus which was the color and model car Lawrence was in. *Id.* Lawrence repeatedly requested for his paperwork back so he could leave, asserting that his rights were being violated. *Id.*

Back-up officer Alan Rhodes arrived and parked his vehicle behind Lawrence's car. (Doc. 70, ¶ 24). Rhodes is 5'10" and weighs 275 pounds. (Doc. 69-5 at 5). When Rhodes arrived, he did not observe any confrontation going on. *Id.* at 34. Woodruff began explaining to Rhodes what was going on, and Lawrence approached Rhodes. *Id.* at 34–35. Rhodes requested Lawrence to step back while Rhodes figured out what was happening. *Id.* at 35. Lawrence continued to step toward Rhodes. *Id.* at 37–40. After Lawrence refused to remain by his vehicle as

---

courts. *United States v. Sterling,* 738 F.3d 228, 233 n.1 (11th Cir.2013), cert. denied, 134 S.Ct. 2682 (2014).

instructed by Rhodes, Rhodes tried to detain Lawrence by handcuffing him. *Id.* at 43. According to Rhodes, what ensued was a "wrestling match" between Rhodes and Lawrence. *Id.* at 44. Skipper described it as a "struggle." (Doc. 69-7 at 41). Woodruff, Rhodes, and Skipper testified that, during the struggle, no punches were thrown and no abusive language was used. (Docs. 69-3 at 104; 69-6 at 45; 69-7 at 42). Because no punches were thrown, Rhodes "was doing everything non-lethal at that point in time." (Doc. 69-6 at 45). Lawrence refused to put his hands behind his back. (Docs. 70, ¶33; 64-28). Rhodes was attempting to turn Lawrence around to handcuff him. *Id.*

Lawrence eventually escaped Rhodes' grasp and ran around his car. (Doc. 69-6 at 47). Rhodes followed, drew his Taser, and shot it at Lawrence. *Id.* The Taser was not effective. *Id.* at 49. Rhodes continued to pursue Lawrence, and the two wrestled again. *Id.* at 47. Rhodes handed Woodruff the Taser to drive stun[5] Lawrence. *Id.* at 51–52. While Rhodes tried to hold Lawrence against the car, Woodruff removed the cartridge off the Taser and attempted to drive stun Lawrence.

---

[5] "Tasers can be used in two modes, one is dart or prong mode in which a barbed point makes contact with the skin and the other is drive or dry stun mode in which the electrified tips of the Taser are touched to the skin directly." *Callwood v. Phenix City, Ala.*, No. 2:15CV182-WHA, 2016 WL 6661158, at *2 n.3 (M.D. Ala. Nov. 10, 2016), aff'd sub nom. *Callwood v. Jones*, 727 F. App'x 552 (11th Cir. 2018) (citing *Hoyt v. Cooks*, 672 F.3d 972, 980 (11th Cir. 2012)). "Drive-stun mode causes pain to a subject, but it generally leaves little lasting damage beyond a burn mark. In this way, it is a less serious use of force than the Taser" in probe or prong mode. *Andrews v. Williams*, No. 2:13CV136-MHT, 2015 WL 5735652, at *6 (M.D. Ala. Sept. 30, 2015).

*Id.* at 55–56.  Initially, Lawrence used his free hand and attempted to push the Taser away from his body.  (Docs. 70, ¶ 38; 64-28).

At this point factual disputes arise.  According to Defendants, Lawrence took the Taser out of Woodruff's hand.  (Doc. 65, ¶¶ 96, 97, 99). Plaintiff contends that Lawrence grabbed the barrel of the Taser but did not pull the Taser out of Woodruff's hand.  (Doc. 70, ¶ 40).  Skipper grabbed the Taser too and pulled it toward her.  *Id.* Plaintiff claims Woodruff let go of the Taser in order to access her service weapon. *Id.*, ¶ 41.  Defendant states Skipper could not control the Taser.  (Doc. 65, ¶ 98). Plaintiff disagrees, stating Skipper still had hold of Lawrence's arm when Woodruff shot Lawrence.  (Doc. 70, ¶ 41).

Woodruff shot Lawrence in the abdomen with her service weapon while Skipper was still holding Lawrence's arm.  (Doc. 70, ¶ 41).  Woodruff did not verbally warn Lawrence that she was going to shoot him.  (Doc. 69-3 at 90–91). According to the autopsy report, Lawrence was 6 feet, 1 inch tall and weighed 200 pounds at the time of his death.  (Doc. 63-12). The cause of death on the report was listed as a "gunshot wound to the abdomen." *Id.*

Defendant Adrianne Woodruff is now a retired sergeant from the Dothan County Police Department.  (Doc. 65, ¶ 4). She retired on November 1, 2015 after 24 years of service. *Id.*, *see also* Doc. 64-1 at 2.  At all material times, Defendant

City of Dothan was the employer of Defendants, Benton, Summerlin, and Woodruff in the City of Dothan Police Department.  (Docs. 63-1; 63-5; 63-16).

In December 2016, Plaintiff filed suit against Defendants.  (Doc. 1).  In a two-count amended complaint, Plaintiff sued the City of Dothan, Greg Benton, Chris Summerlin, and Adrienne Woodruff for alleged violation of Lawrence's Fourth Amendment rights pursuant to 42 U.S.C. § 1983.  (Doc. 28).  In count two, he alleged Alabama state law claims of assault and battery against the City, Summerlin, and Woodruff.  *Id.*  Plaintiff has moved for partial summary judgment on the excessive force claims against Woodruff arguing no reasonable jury could find Woodruff's decision to use deadly force to be a reasonable one and Woodruff had fair warning that her use of deadly force was unconstitutional. (Doc. 43).  Defendants filed a motion for summary judgment against Plaintiff on the basis that there was no constitutional violation against Lawrence, and even if there was, Defendants are entitled to qualified immunity for their actions.  (Doc. 63).  On the state law claims of assault and battery, Defendants assert that officers may lawfully use the degree of force reasonably necessary to defend themselves, and in any event, Woodruff would be entitled to peace officer immunity under Alabama law.  *Id.*

## IV.   ANALYSIS

   A.   *Defendants' City of Dothan, Greg Benton, and Chris Summerlin's Motion for Summary Judgment (Doc. 63)*

In his response to Defendants' motion for summary judgment, Plaintiff states he "does not oppose the dismissal of Benton, Summerlin, and the City of Dothan." (Doc. 70 at 11). **Accordingly, Defendants' motion for summary judgment (Doc. 63) is due to be granted in part as to Defendants Greg Benton, Chris Summerlin, and the City of Dothan.**

      B.    *Defendant Woodruff's Motion for Summary Judgment (Doc. 63)*

      1.    <u>Section 1983 Claim</u>

Woodruff moves for summary judgment on Count I arguing there was no constitutional violation of Lawrence's rights. She submits that requesting to see Lawrence's driver's license was lawful, probable cause existed to support Lawrence's arrest, and the force used by Woodruff was objectively reasonable. (Doc. 64). Therefore, she claims she is entitled to summary judgment on Plaintiff's § 1983 claim against her. *Id.* Even if Plaintiff is able to demonstrate a constitutional violation, Woodruff argues she is entitled to qualified immunity. *Id.*

Qualified immunity completely "protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The essence of a qualified immunity analysis is an officer's objective reasonableness. *See Harlow v.*

*Fitzgerald*, 457 U.S. 800, 819 (1962); *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002).  If reasonable officers could differ on the lawfulness of the defendant's actions, the defendant is entitled to immunity. *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003). Qualified immunity gives ample room for mistaken judgments but does not protect "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).

"The qualified immunity inquiry involves three steps: (1) the alleged conduct must fall within the scope of the discretionary authority of the actor; (2) if it does, we must then determine whether that conduct violates a constitutional right; (3) if so, we must inquire whether the asserted right was clearly established at the time of the alleged violation." *Tinker v. Beasley*, 429 F.3d 1324, 1326 (11th Cir. 2005).

The qualified immunity analysis first requires an officer "prove that '[s]he was acting within the scope of [her] discretionary authority when the allegedly wrongful acts occurred.'"  *Lee*, 284 F.3d at 1194 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)).  In determining whether an official is acting within the scope of her discretionary authority, courts consider "whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'"  *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (citations omitted).  Here, Sergeant Woodruff was on duty assigned to supervise the Dothan Animal Shelter

12

when she encountered Lawrence who was threatening to abandon a dog at the end

of the road.  Woodruff's questioning of Lawrence about the dog would certainly be

a duty that fell within her job responsibilities as Animal Services Supervisor, and

therefore she was acting within her discretionary authority.  Plaintiff does not appear

to dispute this.  (Doc. 70 at 29).

Once a defendant officer successfully shows that she was acting within her

discretionary authority, courts use a two-part test to determine whether qualified

immunity applies.  In *Saucier v. Katz*, the Supreme Court directed courts to first

determine whether there was a constitutional violation and to second determine

whether the constitutional right in question was clearly established. 533 U.S. 194,

201 (2001).  The Court subsequently held, however, that courts need not adhere to

*Saucier's* rigid two-step inquiry, and courts can decide the second question without

reaching the first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

> On reconsidering the procedure required in *Saucier*, we conclude
> that, while the sequence set forth there is often appropriate, it should
> no longer be regarded as mandatory.  The judges of the district
> courts and the courts of appeals should be permitted to exercise
> their sound discretion in deciding which of the two prongs of the
> qualified immunity analysis should be addressed first in light of the
> circumstances in the particular case at hand.

*Id.*

a.    <u>*Terry* Stop</u>

Plaintiff argues that Woodruff violated the Constitution and clearly

established law in seizing Lawrence in order to force him to produce his driver's

13

license.   (Doc. 70 at 36–39).   Defendants claim that Woodruff had reasonable suspicion to conduct an investigatory stop because of Lawrence's threats to abandon the dog on the road.   (Doc. 64 at 31).   Alabama law authorizes an officer to stop a person "whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address, and an explanation of his actions."   ALA. CODE § 15-5-30.   As pointed out by Plaintiff, however, a vague threat to commit a crime at some point in the future does not constitute an imminent threat that a crime is about to be committed.   Even Woodruff testified that Lawrence's threat to dump the dog at some point in the future was not a basis to arrest him. Shelter personnel acknowledged that such threats are made monthly, but no one has abandoned a dog after leaving the shelter.

As explained by Skipper, the standard practice at the Dothan Animal Shelter is to record the tag number of the person's vehicle so the person can be located in the unlikely event a dog is abandoned.   Woodruff wrote down Lawrence's tag number. Considering Woodruff's subsequent actions and the totality of the circumstances, the court finds questions of fact preclude a finding that the continued seizure of Lawrence after that point was reasonable.   As explained by the Supreme Court, "[t]he scope of the search must be 'strictly tied to and justified by' the circumstance which rendered its initiation permissible." *Terry v. Ohio*, 392 U.S. 1, 19 (1968) (citations omitted).   "[A]n investigative detention must be temporary and

last no longer than is necessary to effectuate the purpose of the stop," *Florida v. Royer*, 460 U.S. 491, 500 (1983), and the seizure must "cease once … suspicions [have been] allayed," *Croom v. Balkwill*, 645 F.3d 1240, 1251 n.15 (11th Cir. 2011) (citing *Royer*, 460 U.S. at 500). Although Woodruff makes reference to Lawrence blocking the view of the license tag number, she was able to successfully obtain the information and call it in. Once Woodruff's initial purpose or mission was complete, continued detention beyond that must be supported by reasonable suspicion. *See United States v. Hernandez*, 418 F.3d 1206, 1209, n.3 (11th Cir. 2005). The tag number matched the vehicle. She had the information she needed in the event the dog was "dumped" on the road at some point later. Reasonable suspicion may have supported this initial investigatory stop, but the court finds that questions of fact exist as to whether Woodruff had objective legal grounds to continue to detain Lawrence after obtaining the tag number.

While it is true that Lawrence subsequently refused to provide his driver's license, Lawrence was not driving at the time. *See* ALA. CODE § 32-6-9 ("Every licensee shall have his or her license in his or her immediate possession at all times *when driving* a motor vehicle and shall display the same, upon demand of … a peace officer.") (emphasis added). And it is undisputed, Lawrence identified himself, albeit not by providing any official documentation. Lawrence's refusal to produce a driver's license in the face of an unlawful detention cannot form the basis of a

reasonable suspicion that he did not possess a valid driver's license in an effort to create a basis to detain him.  "[A] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Fla. v. Bostick*, 501 U.S. 429, 437 (1991).

An officer is entitled to qualified immunity if he has "arguable" reasonable suspicion for a *Terry* seizure.  *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000).  Viewing the facts and all reasonable inferences in a light most favorable to Plaintiff, there was no reasonable basis for the continued seizure of Lawrence after Woodruff had obtained Lawrence's tag number.  Accordingly, a jury could conclude that a constitutional violation occurred in Woodruff's continued seizure of Lawrence, and therefore qualified immunity would not preclude Plaintiff's claim.

### b.   Excessive Force

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). The Supreme Court has held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under" a reasonableness standard. *Graham*, 490 U.S. at 395.  As a general rule, an officer has the power to use a reasonable amount of force, or threat thereof, in making an arrest

16

or investigatory stop. *Id.* at 396 (citing *Terry*, 392 U.S. at 22–27). When a plaintiff claims an officer used excessive force, courts utilize an objective test to determine the reasonableness of the officer's actions in light of the totality of the circumstances. *Id.*

Courts will find an officer's use of force to be excessive under the Fourth Amendment, and therefore a constitutional violation, if the use of force was "objectively [un]reasonable in light of the facts and circumstances confronting" the officer. *Graham*, 490 U.S. at 397 (quotation omitted). The amount of force used will be found reasonable only if it was "necessary in the situation at hand." *Lee*, 284 F.3d at 1197 (quotation omitted). The Supreme Court has identified several factors courts should consider in evaluating whether force was constitutionally necessary: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) ("To balance the necessity of the use of force used against the arrestee's constitutional rights, a court must evaluate [the *Graham*] factors.").

In considering these factors, Defendants argue no constitutional violation occurred.  (Doc. 64 at 42–43).  On the first factor, Defendants acknowledge the crime was not severe, but contend that Lawrence's resistance had the potential to escalate

into a serious crime.  *Id.*  On the second factor, Defendants argue Lawrence posed an immediate threat of serious bodily harm because he took the Taser from Woodruff's hand.  However, the facts are disputed on this point.  Plaintiff argues that Woodruff released the Taser to access her gun, and her subjective belief that she or the other officers were in danger is irrelevant.  Plaintiff submits under the applicable objective standard, no objective reasonable officer would have perceived that deadly force was warranted.  On the third factor, although Lawrence attempted to evade Rhodes' grasp, there is no evidence Lawrence was attempting to flee the scene.

Plaintiff relies on *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), for the clearly established right at the time of the alleged violation that a fleeing felon should be given some warning about the possibility that deadly force will be used.  It is undisputed that Woodruff gave no warning before shooting Lawrence.  "*Garner* clearly established that [the decedent] had a right to be free from deadly force when he was not threatening the officers, was merely suspected of misdemeanor offenses, and was attempting to escape."[6]  *Smith v. LePage*, 834 F.3d 1285, 1297 (11th Cir. 2016).  The alleged offenses here were certainly minor (or non-existent).  Woodruff acknowledges that Lawrence did not verbally or physically threaten her, but his

---

[6] Plaintiff notes the Supreme Court recently held that the general rules set forth in *Garner* and *Graham* can constitute clearly established law, but only in obvious cases, which Plaintiff urges is present here.  (Doc. 70 at 44) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)).

mannerisms of "getting in her face" and coming too close to her made her uncomfortable.  Plaintiff argues that Woodruff released the Taser.  Woodruff acknowledged that a Taser in stun gun mode will cause extreme pain, but not incapacitation.  (Doc. 69-3 at 95).  Defendants' expert agrees generally that a Taser in drive stun mode does not ordinarily justify deadly force because it only causes pain and is not likely to cause serious injury.  (Doc. 69-13 at 102–04).  In a light most favorable to Plaintiff, a jury could conclude that Lawrence did not pose a serious threat of harm to the officers to warrant the use of deadly force by Woodruff.

With regard to Woodruff's claim of qualified immunity, the Eleventh Circuit has recently provided additional guidance.

> In an excessive-force case, where qualified immunity has been pled, "[o]ur circuit uses two methods to determine whether a reasonable officer would know that his conduct is unconstitutional" under the Fourth Amendment. *Fils v. City of Aventura*, 647 F.3d 1288, 1291 (11th Cir. 1991). The first considers "the relevant case law at the time of the violation; the right is clearly established if a concrete factual context exists so as to make it obvious to a reasonable government actor that his actions violate federal law." *Id.* (citation, internal quotation marks, and alteration omitted). "This method does not require that the case law be 'materially similar' to the officer's conduct;" "[b]ut, where the law is stated in broad propositions, 'a very high degree of prior factual particularity may be necessary.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 740-41, 122 S. Ct. 2508, 2516, 153 L.Ed.2d 666 (2002)).
>
> The second method looks "not at case law, but at the officer's conduct, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law.'" *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)) (alteration omitted) (emphasis added). The cases

fitting this method are known as "obvious clarity," *id*. (quoting *Vinyard*, 311 F.3d at 1355), "a 'narrow exception' to the normal rule that only case law and specific factual scenarios can clearly establish a violation," *id*. (quoting *Lee*, 284 F.3d at 1198–99).

In considering an excessive-force case, a court should determine whether an officer's conduct in making an arrest is objectively reasonable or if it is an over-reactive, disproportionate action for the situation relative to the response of the apprehended person. The latter is the sort of unconstitutional conduct that deprives an officer of qualified-immunity protection in an obvious-clarity case.

*Stephens v. DeGiovanni*, 852 F.3d 1298, 1315–16 (11th Cir. 2017).

Plaintiff argues that viewing the facts in a light most favorable to him, the evidence shows Lawrence grabbed the Taser as an act of self-protection, that he never possessed the Taser, and that he never came close to having the ability to use the Taser as a weapon. Lawrence was restrained the entire time by Rhodes who was as big, if not bigger, than Lawrence. Woodruff had the assistance of Skipper who had hold of Lawrence's arm. Nothing about the situation warranted the use of deadly force, and Woodruff should have given some type of warning before shooting Lawrence. Rhodes and Skipper did not even realize initially it was Woodruff who had fired the gun.

The Eleventh Circuit explains,

Even at the summary judgment stage, not all defendants entitled to the protection of the qualified immunity defense will get it. The ones who should be given that protection at the summary judgment stage are those who establish that there is no genuine issue of material fact preventing them from being entitled to qualified immunity. And that will include defendants in a case

where there is some dispute about the facts, but even viewing the evidence most favorably to the plaintiff the law applicable to that set of facts was not already clearly enough settled to make the defendants' conduct clearly unlawful. But if the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial.

*Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002).  Because the court finds disputed issues of material fact are inconsistent with qualified immunity being granted, Woodruff's motion for summary judgment is due to be **denied**.

### 2.   State Law Claims of Assault and Battery

In response to the state law claims of assault and battery asserted against her in Count II, Woodruff seeks summary judgment in her favor on the basis of peace officer/state agent immunity under ALA. CODE § 6-5-338(a).[7]  Under § 6-5-338(a), a state agent "shall have immunity from tort liability arising out of his or her conduct

---

[7] "Every peace officer and tactical medic, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as a peace officer or tactical medic by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers or tactical medics, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."

Ala. Code § 6-5-338(a).

in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338(a).

Woodruff asserts that her decision to use deadly force to stop Lawrence in these circumstances was authorized by Ala. Code §13A-3-27, which provides in pertinent part that "a sworn officer is justified in using force upon another person when and to the extent that [s]he reasonably believes is necessary … [t]o defend themselves or a third party from what he/she reasonably believe to be the use or imminent use of physical force while attempting to effect an arrest or while attempting to prevent an escape." The statute further provides that the use of deadly force is justified by a law enforcement officer when "[i]t is necessary to defend themselves or a third party from what he/she reasonably believes to be the use or imminent use of deadly physical force." *Id.* (Doc. 64 at 52).

"Whether a qualified peace officer is due § 6–5–338(a) immunity is now judged by the restatement of State-agent immunity articulated by *Ex parte Cranman*, 792 So.2d 392 (Ala. 2000)." *Hollis v. City of Brighton*, 950 So. 2d 300, 308 (Ala. 2006) (citations omitted).

> By enacting [§ 6–5–338], the Legislature intended to afford municipal law-enforcement officials the immunity enjoyed by their state counterparts. *Sheth v. Webster*, 145 F.3d 1231, 1237 (11th Cir. 1998). Indeed, "[t]his statute, by its terms, extends state-agent immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties." *Moore v. Crocker*, 852 So.2d 89, 90 (Ala. 2002) (emphasis added).

> In *Ex parte Cranman*, *supra*, this Court "restated the law of state-agent immunity in Alabama." *Moore*, 852 So.2d at 90. Since *Cranman*, we analyze immunity issues in terms of "State-agent" immunity, rather than "under the dichotomy of ministerial versus discretionary functions." *Ex parte Hudson*, 866 So.2d 1115, 1117 (Ala. 2003). *See also Giambrone v. Douglas*, 874 So.2d 1046, 1052 (Ala. 2003); *Ex parte Turner*, 840 So.2d 132, 134 n. 1 (Ala. 2002). Thus, we will address the applicability of peace-officer immunity under the principles set forth in *Cranman*. *See Moore*, *supra*; *Ex parte Duvall*, 782 So.2d 244 (Ala. 2000).

*Id.* (quoting *Howard v. City of Atmore*, 887 So.2d 201, 203 (Ala. 2003)).

The party claiming immunity bears the initial burden of "demonstrating that the plaintiff's claims arise from a function that would entitle the state agent to immunity." *Hollis*, 950 So. 2d at 309.  If the required showing is made by the defendant, the burden shifts to the plaintiff to show that the state agent "acted willfully, maliciously, fraudulent, in bad faith, or beyond his or her authority." *Id.*

As discussed above, questions of material fact exist as to why Woodruff used deadly force in this situation which appeared to be a non-deadly force situation. There is adequate evidence to suggest that Woodruff's frustration with Lawrence's attitude of confrontation and non-cooperation (including her knowledge that he espoused "sovereign citizen" rhetoric) impaired her judgment as a law enforcement officer, to the point that a jury could find she was then acting maliciously or in bad faith. These factual disputes preclude a finding that qualified immunity applies, and therefore it is recommended that Woodruff's motion for summary judgment as to Plaintiff's state law claims be **denied**.

C.     *Plaintiff's Motion for Partial Summary Judgment (Doc. 43)*

Plaintiff seeks partial summary judgment against Woodruff on the excessive force claims pursuant to 42 U.S.C. § 1983.  (Doc. 43).  As discussed above, material factual disputes exist regarding Woodruff's entitlement to qualified immunity.  In a light favorable to Woodruff, these factual disputes preclude summary judgment in Plaintiff's favor because Plaintiff is unable to satisfy his burden of proof—as it relates to Woodruff—whether there was a constitutional violation and whether the constitutional right in question was clearly established at the time of the alleged conduct.  Accordingly, Plaintiff's Motion for Partial Summary Judgment (Doc. 43) is due to be **denied**.

## V.     RECOMMENDATION

Accordingly, for the reasons as stated, it is respectfully **RECOMMENDED** that:

1. Plaintiff's Motion for Partial Summary Judgment (Doc. 43) be **denied**; and

2. Defendants' Motion for Summary Judgment on behalf of the City of Dothan, Alabama; Greg Benton, and Chris Summerlin (Doc. 63) be **granted** and final summary judgment be entered in these Defendants' favor, and Defendants' Motion for Summary Judgment as to Adrienne Woodruff (Doc. 63) be **denied**.

## VI.    NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. Accordingly, it is hereby **ORDERED** that any objections to the Report and Recommendation shall be filed on or before **August 8, 2018**. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; see also 28 U.S.C. § 636(b)(1).

**Respectfully recommended** this 25th day of July, 2018.

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE