## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CHRISTOPHER CANTU, as the )
Administrator of the Estate of )
Robert Earl Lawrence, )
                         )
     Plaintiff, )
                         )
v. )     Case No. 1:16-cv-1003-ECM-DAB
                         )
CITY OF DOTHAN, ALABAMA, )
*et al.*, )
                         )
     Defendants. )

## MEMORDANDUM OPINION AND ORDER

This cause comes before the Court on the parties' cross motions for summary judgment: Plaintiff's Motion for Partial Summary Judgment (Doc. 43) and Defendants' City of Dothan, Alabama, Benton, Summerlin, and Woodruff's Motion for Summary Judgment (Doc. 63). The Magistrate Judge, after considering these motions, submitted a Report and Recommendation (Doc. 73) recommending Plaintiff's Motion for Partial Summary Judgment (Doc. 43) be denied; and Defendants' Motion for Summary Judgment on behalf of the City of Dothan, Alabama; Greg Benton, and Chris Summerlin (Doc. 63) be granted and final summary judgment be entered in these Defendants' favor, and Defendants' Motion for Summary Judgment as to Adrienne Woodruff (Doc. 63) be denied. Based on an independent review of the record and for the reasons discussed below, the Report

and Recommendation will be ADOPTED IN PART and REJECTED IN PART. It will be ADOPTED as to the Magistrate Judge's recommendation that summary judgment is due to be granted as to Defendants Greg Benton, Chris Summerlin, and the City of Dothan. However, the Court will reject the Magistrate Judge's recommendation on summary judgment to deny Woodruff qualified immunity.

## I.    JURISDICTION AND VENUE

The court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue.

## II.   STANDARD OF REVIEW

A district court judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 18 U.S.C. § 636(b)(1). The court reviews the Recommendation using the same summary judgment standard applied by the Magistrate Judge. (*See* Doc. # 209, at 4–6.) Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.  BACKGROUND

Plaintiff Christopher Cantu is the personal representative of the Estate of Robert Earl Lawrence who was fatally shot by Defendant Adrianne Woodruff, a Dothan Police Department sergeant. The material facts are largely undisputed. The shooting and the events leading up to it are captured on multiple video and audio recordings, including a video from inside the office of the Dothan County Animal Shelter, a cell-phone video recorded by Lawrence's girlfriend and himself, and the dash-mounted camera in Officer Alan Rhodes' patrol car. There are also audio recordings of three telephone calls from the animal shelter to Dothan Police dispatch.

On December 30, 2014, Lawrence entered the Dothan County Animal Shelter reception area with a dog he wanted to surrender. Woodruff was the sergeant on duty assigned to supervise the animal shelter. Receptionist Patricia Holley and Chief Animal Services Officer Renee Skipper were also working at the shelter that day. Lawrence told Holley he was from Geneva County, and she advised that the shelter only accepted animals from Houston County. Lawrence stated that he found the dog at a Wal-Mart in Dothan, Alabama. Woodruff walked in from the adjoining office after she heard Lawrence getting upset about being asked for identification. Lawrence refused to produce identification, purporting to cite federal law and claiming invasion of privacy. Woodruff agreed to accept the dog without Lawrence producing identification if he would sign a routine intake form. Lawrence refused to sign the form and threatened to abandon the dog at the end of the road. Woodruff

3

told him that abandoning the animal would be a crime. Lawrence complained that his rights were being violated and picked the dog up to leave. Woodruff asked him for identification, which Lawrence again refused, stating it was a violation of his rights.

Skipper testified that when people threaten to abandon a dog outside the shelter, the procedure is to write down the tag number of the person's vehicle in the event the dog is later found. As Lawrence was leaving the shelter with the dog, Woodruff followed him to write down the tag number of Lawrence's vehicle. As Woodruff followed Lawrence, she observed an empty gun holster on his hip. She asked Lawrence about the gun, and he told her that it was in his car. Woodruff asked her assistant to call for back-up.

Lawrence walked toward his car and called out to his girlfriend in the car: "Get the video. This is going to be a good one." Lawrence sat in the driver's seat of the car which was still running. Woodruff went to the rear of the vehicle to copy the tag number, but Lawrence got out of his car and attempted to block her view of the tag; she ultimately got the tag number. Woodruff also testified that she could not communicate the tag number initially to dispatch because she could not get through on the telephone. Woodruff called police dispatch to request her back-up. Lawrence told Woodruff he was leaving, but she told Lawrence he could not leave without showing her a driver's license. Lawrence argued with Woodruff, stating that he did

not have a drivers license or need one because she had not seen him driving and further demanded that Woodruff tell him the statutory definition of "driving." Lawrence produced a piece of paper titled an "AFFIDAVIT OF IDENTITY." The document stated that it was "duly affirmed upon oath and full commercial liability" and included Lawrence's name, his "current post" and "Date of origin." The Affidavit purported to be proof of his description, picture, right thumb print, and signature. Based on her training, Woodruff believed Lawrence to be a "Sovereign Citizen."

Lawrence demanded that Woodruff return his identification paper. Woodruff said she would first call police dispatch to request a warrant check for Lawrence. Lawrence told Woodruff that she had "no right or authority" and repeatedly demanded that Woodruff return his paper. Skipper brought Woodruff a portable telephone, and Woodruff called to verify that there were no warrants for Lawrence. After confirming that Lawrence had no outstanding warrants, Woodruff stayed on the call with dispatch, and the exchange between Lawrence and Woodruff was recorded. After Woodruff ran the tag for his vehicle, the tag came back registered to a silver Lexus, which was the color and model of the car that Lawrence was in.

The dashboard camera in Rhodes's patrol car shows that he arrived at shelter and parked his patrol car behind Lawrence's car at 12:41:13 PM. The video shows Woodruff on a telephone and holding papers behind and to the driver's side of the

5

silver Lexus, and Lawrence standing beside the open driver's door of the car while lighting a cigarette and holding a cell phone to record the incident.  At 12:41:20 PM, the video shows Woodruff hang up the phone and Lawrence begin to approach Rhodes's patrol car, holding a cell phone in his right hand recording the incident.  At 12:41:24 PM, Rhodes comes into the left frame of the video, and as he points to the silver Lexus he can be heard telling Lawrence, "Hey, don't even start. Stand over there with the car, and I'll be with you in a second."  Lawrence backs up and stands at the bumper of the silver Lexus at 12:41:33 PM.  Woodruff begins to explain the events to Rhodes.  Less than ten seconds after backing up to the silver Lexus, Lawrence again begins to walk toward Woodruff and Rhodes.  Rhodes points at Lawrence and says, "Did I tell you to stand over there? You need to stand by the car where I tell you to or you're going to jail now!"  Lawrence can be heard in the background arguing with Rhodes saying "Yes sir, I'm utilizing my First Amendment right for free speech." Rhodes responded, "You can stand by the car where I tell you to or you can go to jail now."  Lawrence backed up but continued to argue with Rhodes about "utilizing his rights," and Rhodes responded that "You can utilize it where I tell you to stand."  Lawrence responds "Ok, where's that … can you tell me where you … I'm not arguing with you sir, I'm trying to figure out the back side of this."  Lawrence and Rhodes continued to speak over each other, and at 12:41:53

PM in the video, Rhodes approaches Lawrence as he says, "Do you want to argue with me more? Turn around. Turn around."

Rhodes and Woodruff both pinned Lawrence against the Silver Lexus as he repeated "Oh, no no no no … Don't touch me!" and resisted their efforts. Lawrence waved the cellphone in his right hand away from the officers as he yelled for his girlfriend to "get this … get this … look at this … look at this" and continued to resist arrest as he shouted "I'm a peaceful man … stop! Get off me, get off me." Rhodes asks Lawrence, "Are you going to turn around for me?" and Lawrence yells back, "No, I'm not!" The three continued to struggle, and Lawrence continued to yell and demand that the officers stop as he protested that his arrest was an "unlawful detainer." After physically resisting arrest for over a minute, Lawrence breaks away from the officers' grasp at 12:43:12 PM on the video and begins to run around the car fleeing from the officers. Rhodes deploys his Taser at Lawrence at 12:43:19 PM on the video, but Lawrence, who was wearing a thick jacket, shows no signs that the Taser had any effect on him. Rhodes continued to attempt to physically restrain Lawrence, and Lawrence continued to physically resist while yelling, "Stop!" repeatedly. Neither the video nor audio indicate that Lawrence ever stopped actively resisting arrest, and he continued to wrestle with the officers. At 12:44:02 PM, the video shows Woodruff attempting to use the Taser in drive stun mode as Rhodes repeatedly tells Lawrence to "Turn around!" Four seconds later, Lawrence can be

heard yelling, "Don't do it! Stop!" as he reaches and grabs the Taser. Plaintiff admits that "Woodruff held the Taser with her finger on the trigger" and that "Lawrence grabbed Woodruff's Taser." (Doc. 43 at ¶¶ 26-27).[1] The Taser can be heard briefly firing, and then Skipper reached in and pulled Lawrence's arm away from the scrum while both he and Woodruff were holding the Taser. One second later, Woodruff can be seen removing her pistol from the holster on her belt and discharging it by Lawrence's side. Woodruff shot Lawrence in the abdomen with her service weapon while Lawrence continued to hold the Taser and struggle against Skipper and Rhodes. Lawrence did not release his grasp on the Taser until after Woodruff discharged her gun. Woodruff did not verbally warn Lawrence that she was going to shoot him. Lawrence died as a result of the gunshot wound.

At all material times, Defendant City of Dothan was the employer of Defendants Benton, Summerlin, and Woodruff in the City of Dothan Police Department. (Docs. 63-1; 63-5; 63-16).

In December 2016, Plaintiff filed suit against Defendants. (Doc. 1). In a two-count amended complaint, Plaintiff sued the City of Dothan, Greg Benton, Chris Summerlin, and Adrienne Woodruff for alleged violation of Lawrence's Fourth

---

[1] Plaintiff further alleges that during this altercation in which Rhodes and Woodruff were trying to subdue Lawrence, "Officer Skipper grabbed Lawrence's arm and pulled it toward her (with Woodruff still holding the Taser and Lawrence holding it as well but not by the grip)." *Id.* at ¶ 28. However, after thoroughly and repeatedly viewing all available video of the incident that has been submitted as exhibits in support of the parties' respective motions, this Court finds that there is insufficient clarity in any view to determine which part of the Taser Lawrence was grasping.

Amendment rights pursuant to 42 U.S.C. § 1983. (Doc. 28). In Count II, Plaintiff alleged Alabama state law claims of assault and battery against the City, Summerlin, and Woodruff. *Id.* Plaintiff has moved for partial summary judgment on the excessive force claims against Woodruff, arguing that no reasonable jury could find Woodruff's decision to use deadly force to be a reasonable one and that Woodruff had fair warning that her use of deadly force was unconstitutional. (Doc. 43). Defendants filed a motion for summary judgment against Plaintiff on the basis that there was no constitutional violation against Lawrence, and even if there was, Defendants are entitled to qualified immunity for their actions. (Doc. 63). On the state law claims of assault and battery/excessive force in Count II, Defendants assert that officers may lawfully use the degree of force reasonably necessary to defend themselves, and in any event, Woodruff would be entitled to peace officer immunity under Alabama law. *Id.*

## IV. DISCUSSION

### A. Defendants City of Dothan, Greg Benton, and Chris Summerlin

Plaintiff did "not oppose the dismissal of Benton, Summerlin, and the City of Dothan" in his briefs to this Court (Doc. 70 at 11) and did not object to the Magistrate Judge's recommendation to grant summary judgment in favor of those parties. (Doc. 78). Accordingly, the recommendation is adopted in part to the extent that the Magistrate Judge recommended that "Defendants' motion for summary judgment

(Doc. 63) is due to be granted in part as to Defendants Greg Benton, Chris Summerlin, and the City of Dothan." (Doc. 73 at 11).

## B. Defendant Woodruff

### 1. Count I – Excessive Force

Plaintiff's first claim is that "Woodruff, acting under color of law within the meaning of 42 U.S.C. § 1983, used deadly force on Lawrence, thereby depriving Lawrence of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States in violation of 42 U.S.C. § 1983. Specifically, she violated Lawrence's right to be free from excessive force." (Doc. 28 at ¶ 65).

"[T]he question we ask is whether, under [the plaintiff's] version of the facts, [the officer] behaved reasonably in the light of the circumstances before him." *Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008)(citation and internal quotation marks omitted). The excessive-force "area is one in which the result depends very much on the facts of each case." *Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S. Ct. 596, 600, 160 L. Ed. 2d 583 (2004). Excessive-force claims are fact-specific; whether the force an officer uses is *reasonable* "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed. 2d 443 (1989).

> "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*,

490 U.S. at 396–97, 109 S.Ct. 1865. We make this inquiry without regard to the officer's underlying intent or motivation. *Id.* at 397, 109 S.Ct. 1865.

*Wate v. Kubler*, 839 F.3d 1012, 1019–20 (11th Cir. 2016).

Courts must examine "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily [or psychological] harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 383, 127 S.Ct. 1769, 1778, 167 L.Ed.2d 686 (2007)).

*Stephens v. DeGiovanni*, 852 F.3d 1298, 1318 (11th Cir. 2017). The Eleventh

Circuit has further held that

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force *in the course of an arrest*." *Lee*, 284 F.3d at 1197 (emphasis added). The *Graham* objective-reasonableness standard governs judicial determination of claims of official use of excessive force. "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Id.* (citation and internal quotation marks omitted). In deciding whether an officer is entitled to summary judgment based on qualified immunity, the question of whether the force used by the officer in the course of an arrest is excessive is a "'pure question of law,'" decided by the court. *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (quoting *Scott*, 550 U.S. at 381 n.8, 127 S.Ct. at 1776 n.8).

To determine "whether the force used to effect a particular seizure is 'reasonable,' " the *Graham* Court noted three nonexclusive factors for evaluating an officer's necessity for using force against an arrestee's Fourth Amendment rights: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety

of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."

*Stephens*, 852 F.3d at 1321 (emphasis in original).

### a. Probable Cause

Plaintiff initially conceded in his motion for summary judgment that "[Lawrence] at most had committed a minor crime and was resisting an arrest he believed was unlawful." (Doc. 43 at 23). Plaintiff confirmed this position in his reply brief in support of his motion: "Defendant spends most of her brief arguing that Woodruff and Rhodes were justified in detaining and arresting Lawrence and justified in using the Taser on Lawrence, matters not disputed by plaintiff for the purposes of his motion." (Doc. 52 at 1). Woodruff argues that her "request to see Lawrence's driver's license was lawful because he had just threatened to commit a crime, then sat behind the wheel of a car to drive away. Furthermore, probable cause existed to support his arrest for obstructing government operations, refusing a lawful order to present a driver's license, refusing a lawful order to back away, resisting arrest, disorderly conduct, harassment of a police officer, menacing, attempted assault of a police officer with a dangerous instrument and taking a police officer's weapon." (Doc. 64 at 28). However, Plaintiff changed course in responding to Defendants' motion for summary judgment, newly arguing that "Woodruff's admonishment to Lawrence not to dump the dog and writing down his tag should have been the limit of her assertion of authority." (Doc. 70 at 36).

12

Plaintiff appears to argue that Woodruff lacked reasonable suspicion to detain Lawrence after he exited the shelter. Plaintiff does not dispute that Lawrence threatened "to abandon the dog down the road" (Doc. 70 at 36) or that doing so would have been a criminal offense. *See* § 13A-11-14(a)(2), Ala. Code 1975 ("A person commits the crime of cruelty to animals if, except at otherwise authorized by law, he or she recklessly or with criminal negligence … subjects any animal in his or her custody to cruel neglect...."). Moreover, Plaintiff acknowledges that under Alabama law, Woodruff, as a law enforcement officer, was authorized to "stop any person abroad in a public place whom [s]he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions." § 15-5-30. Plaintiff argues, however, that "[a] threat to commit a crime in the future is far from being caught "about to commit" a crime." (Doc. 70 at 36).

This Court must view "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts…." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009). In this case, Lawrence attempted to leave the dog with the shelter but refused to cooperate with the most basic of protocols for doing so and left with the dog while threatening to abandon the dog at the end of the road. In the cellphone video recorded by Lawrence's girlfriend, his girlfriend can be heard saying, "Just take the damned dog

back with us." Lawrence can be seen and heard replying to her "Well, that's what I said; I'll just take him down the damn road and drop him off." The question is not, as Plaintiff suggests, whether "persons regularly make such statements" or whether "no one has ever been found to have dumped a dog after leaving the shelter," (Doc. 70 at 36) or even whether "Lawrence's threat to dump the dog at some point in the future was … a basis to arrest him," (Doc. 73 at 14), but whether a reasonable officer having witnessed Lawrence's demeanor, behavior, and threats had probable cause to detain Lawrence and at the minimum write down the tag number on his car, which she did. It would be far less reasonable for an officer to suspect that Lawrence would make a return trip to the same shelter from another county at some distant point in the future for the sole purpose of abandoning an animal to avoid producing identification. There is no evidence before the Court to suggest that Woodruff or Rhodes initiated the arrest of Lawrence due to his threat to abandon the dog.

Moreover, in the cellphone video recorded by Lawrence's girlfriend, Lawrence exited the silver Lexus and said to Woodruff, "That's private property. You have no right to copy down…" and then stood between her and the rear of the vehicle in an attempt to block her view of the license plate on the car. On that same video, Lawrence argued with Woodruff, repeatedly asserting that she was interfering with his "right to travel," that he did not need a driver's license, and that she had not seen him driving. However, he was clearly in the driver's seat of the silver Lexus

with the key in the ignition demanding return of his identification paperwork so he could "leave."  The situation was not simply, as Plaintiff has suggested, that once Woodruff had written down the license plate number from the silver Lexus that probable cause ceased to exist.  On the contrary, the video evidence is incontrovertible that Lawrence was the only person seen in the driver's seat of the silver Lexus, the key was in the ignition, three small children were seated in the back of the car, Lawrence was increasingly agitated and argumentative toward Woodruff, and he was clearly stating that he intended to "leave" and "travel" and refused to show her a driver's license.

Plaintiff argues that Woodruff's demand for Lawrence to produce his driver's license "was beyond her authority" (Doc. 70 at 36) and cites *United States v. Brown*, 731 F.2d 1491, 1494 (11th Cir.), *on reh'g,* 743 F.2d 1505 (11th Cir. 1984), for the proposition "that persons can lawfully refuse to provide a driver's license in this situation." (Doc. 70 at 37-38).  However, the relevant holding in *Brown* was that a Georgia statute prohibited

> only actual lies in order to avoid an unconstitutional construction. The defendants' refusal to furnish identification—which they were entitled to do if indeed this was a *Terry* stop, as the government must contend— may have created suspicion that they had actually used false names, but falls far short of probable cause.

*Brown*, 731 F.2d 1494. *Brown* did not involve a traffic stop, and the opinion does not reference or involve driver's licenses.[2]

Alabama law defines a "driver" as "[e]very person who drives or is in actual physical control of a vehicle." § 32-1-1.1(14), Ala. Code, 1975. Alabama law provides that:

> Every licensee shall have his or her license in his or her immediate possession at all times when driving a motor vehicle and shall display the same, upon demand of a judge of any court, a peace officer, or a state trooper. However, no person charged with violating this section shall be convicted if he or she produces in court or the office of the arresting officer a driver's license theretofore issued to him or her and valid at the time of his or her arrest.

Section 32-6-9(a), Ala. Code, 1975. Concerning the production of a license upon demand, the Alabama Court of Criminal Appeals has held:

> Observing a violation of the state traffic and vehicle safety regulations, the State Trooper had a statutory right to request and inspect the driver's operating license. *See Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979). The trooper had a right to "request" or "demand" the defendant's driver's license. The driver had a statutory duty to "display the same." Alabama Code 1975, Section 32-6-9.

---

[2] In fact, *Brown* only mentions automobiles once, and that is used in contrast to the search of an actual person. "Consensual access to another's body as a place of concealment is so unlikely to be casual, unlike access to a car or house, that a more particularized examination of the defendant's dominion and efforts to guarantee privacy, of the kind undertaken in cases involving cars or houses, would not be helpful." *Brown*, 731 F.2d at 1496.

*Sly v. State*, 387 So. 2d 913, 916 (Ala. Crim. App.), *writ denied sub nom. Ex parte Sly*, 387 So. 2d 917 (Ala. 1980). As to probable cause "if the person was not observed actually driving," the Alabama Court of Criminal Appeals has stated "that circumstantial evidence may be used to show that the defendant was driving." *McLaney v. City of Montgomery*, 570 So. 2d 881, 882 (Ala. 1990).

It is beyond dispute that Lawrence was "in actual physical control of a vehicle," and therefore met the statutory definition of a driver. Moreover, the cell phone video clearly indicates that Lawrence told Woodruff no fewer than four times that he was leaving while she was attempting to verify his identity and before she appears in the video behind the silver Lexus copying the license plate number.

During his protestations, Lawrence leaned out of the window of the silver Lexus and said to Woodruff: "Ok, you're enforcing a statutory code. Do you know the legal definition of that statutory code? Do you know what the definition of 'driving' is under Black's Law Dictionary which is the statutory writing for that code?" As Woodruff walked behind the silver Lexus, Lawrence got out of the car and stated, "This officer is withholding us. She is blocking our vehicle from leaving." Based on the video evidence in this case, it is clear that while Woodruff was lawfully detaining Lawrence for the purpose of copying the license plate information from the silver Lexus, Lawrence repeatedly protested that he was leaving and had no intent of producing a driver's license. Lawrence's agitated,

obstructive behavior regarding whether he had a driver's license and whether Woodruff knew the legal definition of "driving" gave rise to probable cause for Woodruff to reasonably suspect that Lawrence did not have a driver's license and was about to drive without a license. *See* § 15-5-30. Accordingly, Woodruff had statutory authority to demand that Lawrence produce a driver's license, and he had a statutory duty to comply. *See* § 32-6-9(a).

### b. The Arrest

Plaintiff argues that "Lawrence's arrest was a direct result of Woodruff's unlawful detention. Of course, because the detention was unlawful, Lawrence's arrest was also unlawful." (Doc. 70 at 40). The Eleventh Circuit has held:

> Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment. *See Redd v. City of Enterprise,* 140 F.3d 1378, 1382 (11th Cir. 1998) ("[A]n arrest made without probable cause violates the Fourth Amendment."). Under federal law, probable cause to arrest exists "when an arrest is 'objectively reasonable based on the totality of the circumstances.'" *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting *Ferraro,* 284 F.3d at 1195). "This standard is met when the facts and circumstances within the *officer's knowledge,* of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (internal citation and quotation marks omitted). "Although probable cause requires more than suspicion, it 'does not require convincing proof,' and 'need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction.'" *Ferraro,* 284 F.3d at 1195 (internal citations omitted).

*Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003)(emphasis in original).

Upon Lawrence's agitated, confrontational refusal to produce a driver's license, Woodruff had reasonably trustworthy information that would lead a prudent officer to believe that Lawrence was about to commit an offense, i.e., driving without a license. Accordingly, she was authorized to execute a lawful arrest of Lawrence. The United States Supreme Court as well as the Alabama Court of Criminal Appeals have allowed the collective knowledge of the investigating officers to be imputed to each participating officer. *See United States v. Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Shute v. State,* 469 So. 2d 670, 673 (Ala. Crim. App. 1984)("The knowledge of all the officers involved in a police situation may be evaluated collectively in assessing whether that knowledge constituted probable cause as is constitutionally required."). Accordingly, Woodruff's knowledge of Lawrence's refusal to produce a driver's license upon demand while he was in actual physical control of a vehicle may also be imputed to Rhodes in his subsequent arrest of Lawrence.[3]

### b. Deadly Force During the Arrest

In the context of deadly force, the Supreme Court has set out examples of factors that justify the use of such force:

> "Where the officer has probable cause to believe that the
> suspect poses a threat of serious physical harm, either to

---

[3] Additionally, Lawrence's refusal to remain at a safe distance by his car while Rhodes and Woodruff spoke after Rhodes arrived on the scene would have been probable cause for an arrest based on violation of Alabama's statute prohibiting obstruction of governmental operations. § 13A-10-2, Ala. Code, 1975.

> the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."

*Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 1701, 85 L.Ed. 2d 1 (1985). *Garner* says something about deadly force but not everything, especially when facts vastly different from *Garner* are presented. The Supreme Court has cautioned that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' " *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1777, 167 L.Ed. 2d 686 (2007).

Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Graham,* 109 S.Ct. at 1872 (quoting *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed. 2d 447 (1979)) (alteration in original), we must "slosh our way through the factbound morass of 'reasonableness.' " *Scott,* 127 S.Ct. at 1778. Therefore, determining whether "the use of a particular type of force in a particular situation" is "reasonable" in the constitutional sense requires a court to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott,* 127 S.Ct. at 1777, 1778 (quoting *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 2642, 77 L.Ed. 2d 110 (1983)).

In examining whether an officer's use of deadly force is reasonable, we recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 109 S.Ct. at 1872. So "[w]e are loath to second-guess the decisions made by police officers in the field." *Vaughan v. Cox,* 343 F.3d 1323, 1331 (11th Cir.2003).

*Long v. Slaton*, 508 F.3d 576, 580–81 (11th Cir. 2007) (footnote omitted).

Turning to the undisputed facts and video evidence in this case, Lawrence was consistently confrontational, uncooperative, and at times belligerent during his encounter with Woodruff and Rhodes. Aside from producing a homemade affidavit of identity and admitting that he was from Geneva County, Lawrence was antagonistic or actively resistant to every request and command Woodruff and Rhodes directed to him. Lawrence did not merely resist arrest. He actively resisted despite three officers simultaneously attempting to apprehend him. The deployment of a Taser in both prong and drive stun modes had no apparent effect on Lawrence. Lawrence continued to physically struggle, escaped from Rhodes, and led officers on a chase around the silver Lexus in which his girlfriend and three small children were present. He continued his struggle despite the threat his actions posed to the arresting officers and to his own loved ones, who can be heard throughout the struggle.

Plaintiff does not specifically argue that the use of the Taser against Lawrence was excessive force, but Plaintiff argues that the arrest was unlawful and "he was legally entitled to [resist]…" (Doc. 70 at 49). As to Lawrence's behavior leading up to Rhodes's use of the Taser against him, the Eleventh Circuit has found the use of a Taser reasonable under closely similar circumstances. In *Hoyt v. Cooks*, 672 F.3d 972, 979 (11th Cir. 2012), the decedent "resisted during the entire time that [two officers] tried to handcuff him. He spread his arms apart to prevent being handcuffed,

and he rolled around to keep his arms from being pulled behind his back. Even after repeatedly using their Tasers, [the two officers] had considerable difficulty in effecting the arrest."  The Eleventh Circuit held that the two defendant officers "could not wait indefinitely for Allen to stop resisting or for his strange behavior to subside. Allen could not be safely transported until he was restrained. We cannot conclude that clearly established law prevented [the officers] from using their Tasers in the manner used here. Other alternatives, e.g. brute physical force, also presented dangers both to Allen and the officers." *Hoyt*, 672 F.3d at 980.  Similarly, Lawrence can be clearly seen on video resisting arrest, stretching out his arms, shouting at the officers, attempting to escape, running away, and showing no visible effect from the Taser bring deployed against him.  Brute force and a nonlethal Taser showed no signs of subduing Lawrence or dissuading him from continuing this struggle inches from his small children.  Woodruff and Rhodes could not wait indefinitely for Lawrence to stop resisting arrest or merely hope that Lawrence would tire out before they did. *See Callwood v. Jones*, 727 F. App'x 552, 560–61 (11th Cir. 2018), *cert. denied,* No. 17-1569, 2018 WL 2303441 (U.S. Oct. 1, 2018)("Throughout the incident, Illidge resisted all of the officers' attempts to subdue him and ignored their repeated requests to calm down. A reasonable officer could have believed that Illidge continued to resist arrest and that he posed a danger to the officers and himself by resisting.").

The Eleventh Circuit has recognized that when dealing with a traffic stop in which the arrestee failed to comply with documentary requests, "acted in a confrontational and agitated manner," and repeatedly refused to comply with reasonable instructions, even a simple "verbal arrest command accompanied by attempted physical handcuffing" can escalate "a tense and difficult situation into a serious physical struggle in which either [officer or arrestee] would be seriously hurt." *Draper v. Reynolds*, 369 F.3d 1270, 1276-78 (11th Cir. 2004). Even construing the evidence in this case in the light most favorable to Plaintiff, it is beyond dispute that Lawrence refused to comply with requests, was confrontational, agitated, resistant to verbal commands, and that this tense and difficult situation devolved into a serious physical struggle specifically because Lawrence resisted an attempted physical handcuffing.

Plaintiff argues that "Lawrence was not a threat of serious physical harm to the officers at the time he was shot, and no warning was given despite an ample opportunity to give one." (Doc. 70 at 49). Plaintiff's argument that "Lawrence was not a threat of serious physical harm to the officers at the time he was shot" fails on several grounds. Plaintiff's argument assumes that "Lawrence [was trying] to keep Woodruff from hurting him with the Taser," but that Lawrence being in possession of the Taser "was not a threat of serious physical harm to the officers…" (Doc. 70 at 49). How the Taser could be so seriously painful to Lawrence that he would risk

23

unlawfully taking the weapon away from a law enforcement officer, yet that same Taser be "not a threat" to the officers with whom he was wrestling is simply untenable. Plaintiff argues that "Lawrence grabbed the Taser by the body as an act of self protection, that he never possessed the Taser, and that he was not even close to having the ability to use the Taser as a weapon." (Doc. 70 at 45). In light of the video evidence from Rhodes's patrol vehicle camera, Plaintiff's argument is speculative at best and illogical at worst, i.e. that Lawrence could somehow "grab" the Taser yet not "possess" it. The video is not clear enough to determine what specific part of the Taser was in Lawrence's hand, but it is clear that he possessed the Taser and continued to possess it until Woodruff shot him, at which point he can be seen dropping the Taser. By Plaintiff's own argument, it is impossible that anyone else had possession of the Taser when he was shot, because Woodruff had reached for her gun, Skipper was holding "Lawrence's arm out from his body," and Rhodes was using his body to restrain Lawrence. (Doc. 70 at 45-46). Moreover, the standard is not whether Lawrence "was not a threat of serious physical harm to the officers…" (Doc. 70 at 49), but whether Woodruff had "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others…" *Smith*, 834 F.3d at 1295. It is not Lawrence's subjective intent imposed by hindsight, but the officer's objective probable cause to believe a threat of serious physical harm is present in the split-second situation that guides the Court's decision.

Whether Lawrence was holding the Taser by the "body" or had the ability to pull the trigger is not discernible in the video evidence, nor is it the standard by which deadly force cases are analyzed. "Although we view the facts in the light most favorable to the non-moving party," the court must view that evidence as "it would appear to a reasonable officer at the scene." *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008). "In analyzing whether excessive force was used, courts must look at the totality of the circumstances: not just a small slice of the acts that happened at the tail of the story." *Garrett v. Athens-Clarke Cty., Ga.*, 378 F.3d 1274, 1280 (11th Cir. 2004). "And an officer need not wait until he is attacked physically before determining reasonably that he is in imminent danger of serious injury. *Cf. Long v. Slaton*, 508 F.3d 576, 583 (11th Cir. 2007) (concluding the use of deadly force was reasonable, even though other less-lethal means of preventing the suspect's escape may have existed, because 'the police need not have taken that chance and hoped for the best.')." *Wilson v. Miller*, 650 F. App'x 676, 680 (11th Cir. 2016).

The Eleventh Circuit recently affirmed summary judgment in favor of an officer who shot a suspect who "charged at [the officer] while holding a stick that was five and one-half feet long," even though the suspect had not raised or swung the stick because "'[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'" *Wilson v. Parker*, No. 17-15294, 2018 WL 3954222, at *3 (11th Cir. Aug.

17, 2018)(quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (alteration omitted)(quoting in turn *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ).  Lawrence had already shown himself willing and powerful enough to escape from at least two officers attempting to effect an arrest.  The law did not require Woodruff to "hope for the best" after Lawrence took possession of the Taser or even that she hope that Skipper would be able to restrain Lawrence's arm after having seen him escape from Rhodes moments earlier. *See also Wells for Chambers v. Talton*, 695 F. App'x 439, 445 n.2 (11th Cir. 2017)("The fact that [the police officer] was later found to be mistaken about [the suspect] having the gun as he ran away does not defeat qualified immunity. *See Penley* [*v. Eslinger*], 605 F.3d [843,] 854[, (11th Cir. 2010)] (finding that officer's use of deadly force was reasonable where suspect held a toy gun modified to look like a real gun).").

As to Woodruff's failure to give a warning to Lawrence prior to the use of deadly force, the Eleventh Circuit has stated that

> The mere failure to give a warning, however, does not preclude summary judgment where the facts otherwise indicate that the officer's use of force was reasonable. *See Penley v. Eslinger*, 605 F.3d 843, 854 n.6 (11th Cir. 2010); *see also Scott v. Harris*, 550 U.S. 372, 382, 127 S.Ct. 1769, 1777, 167 L.Ed.2d 686 (2007) ("*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'").

*Talton*, 695 F. App'x at 444.  Video evidence from Rhodes's patrol vehicle camera further shows several instances in which Woodruff approached Lawrence to apply

the Taser in drive stun mode, and Lawrence can be seen reaching toward the Taser. Even in the less intense "drive stun" mode, the Taser is a weapon capable of inflicting sufficient pain to impose compliance over another during a struggle. In the moments that Lawrence reached for and ultimately gained possession of the Taser from Woodruff, any reasonable officer could believe that Lawrence intended to use the Taser against officers to cause them severe pain in order to effect an escape. Specifically in this case, a reasonable office would know that after a prolonged and physical resistance to arrest and continuous efforts to escape, Lawrence continued to struggle for over two minutes despite three persons being involved in an increasingly futile effort to restrain him. Lawrence was seemingly unaffected by commands and Taser shocks, and had somehow managed to take the Taser away from one of the arresting officers, all within feet and even inches from the arrestee's girlfriend and three small children. Although the offense that triggered the arrest was relatively minor, Lawrence's belligerent, defiant behavior needlessly escalated the severity of the encounter. The Eleventh Circuit has held that "a person acting unpredictably could present an increased threat to others" such that pausing to give a warning that an officer intends to use deadly force is not feasible. *Wilson*, 2018 WL 3954222, at *3. Wrestling the Taser away from Woodruff presented an immediate threat to the arresting officers, obviating the opportunity for Woodruff to issue a warning prior to using deadly force. Lawrence had shown himself

27

impervious to verbal and physical restraint and showed no signs of being subdued by use of the Taser. Having armed himself with the Taser, Lawrence presented an immediate threat to all the officers such that it was reasonable for Woodruff to use deadly force without further warning, all the more so in the face of Lawrence's demonstrated imperviousness to all verbal commands, physical restraint, or repeated application of the Taser.

Lawrence actively resisted arrest and attempted to escape and evade arrest throughout the encounter. Lawrence's shooting death is a tragedy. However, it was not objectively unreasonable under the Fourth Amendment. *See Martinez v. City of Pembroke Pines*, 648 F. App'x 888, 893 (11th Cir. 2016)("Plaintiff was unresponsive to all commands and gestures, impervious to the taser, and otherwise unable to be restrained."). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Because Woodruff was faced with the split-second decision regarding the force necessary to prevent a physically resistant arrestee from turning a weapon on the officers attempting to secure his arrest, her actions were not objectively unreasonable.

### c. Qualified Immunity

Even if Woodruff's use of deadly force was excessive under the Fourth Amendment, she is alternatively entitled to qualified immunity because she violated

28

no clearly established right. *See Long*, 508 F.3d at 583-4. Qualified immunity protects government officials from suit if they are "performing discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 525–26, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411 (1985). It balances the need to hold the government accountable with the need to protect officers from the distractions of litigation. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

> "We have said many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Priester v. City of Riviera Beach,* 208 F.3d 919, 926 (11th Cir. 2000) (quotations omitted). In determining whether a right is clearly established, we look to the precedent of the Supreme Court of the United States, of this Court, and of the relevant state's highest court. *McClish v. Nugent,* 483 F.3d 1231, 1237 (11th Cir. 2007).

*Hoyt*, 672 F.3d at 977.

> In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right [.]" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The inquiry into whether this right was violated requires a balancing of "'the

nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); see *Graham, supra,* at 396, 109 S.Ct. 1865.

The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Ibid.* "[T]he salient question ... is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.,* at 741, 122 S.Ct. 2508.

*Tolan v. Cotton*, 572 U.S. 650, 134 S. Ct. 1861, 1865–66, 188 L. Ed. 2d 895 (2014)(footnote omitted).

Plaintiff does not dispute that Woodruff was performing a discretionary function when she encountered Lawrence. (Doc. 43 at 21). Thus, the burden is on Plaintiff to prove that Woodruff is not entitled to qualified immunity. *Dalrymple v. Reno*, 334 F.3d 991, 995 (11th Cir. 2003) ("Once the government official has established that she was acting within her discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate").

"The salient question" is whether the law gave Defendant "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 740–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). There are three ways for Plaintiff to prove that a right is clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional

> right; or (3) conduct so egregious that a constitutional right was clearly
> violated, even in the total absence of case law." *Lewis v. City of West
> Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations
> omitted).

*Mighty v. Miami-Dade Cty.*, 728 F. App'x 974, 978 (11th Cir. 2018). Plaintiff does not clearly designate which of the three methods he intends to invoke to establish that Woodruff violated a clearly established constitutional right enjoyed by Lawrence. However, Plaintiff relies on two cases for the proposition that Woodruff was on notice: *Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985)( "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."); and *Mercado v. City of Orlando*, 407 F.3d 1152, 1159–60 (11th Cir. 2005) ("Mercado, however, relies on the principle that deadly force cannot be employed in a situation that requires less-than-lethal force."). Specifically, Plaintiff argues that "Garner makes clear that even fleeing felons have a right not to be seized by deadly force and that deadly force is only intended to be used to stop dangerous persons who refuse to submit to arrest. Certainly, Lawrence's rights are greater than such persons." (Doc. 43 at 20).

In *Mercado*, the Eleventh Circuit held:

> Officer Padilla should not have needed case law to know that by intentionally shooting Mercado in the head, he was violating Mercado's Fourth Amendment rights. When the officers entered the apartment, they found Mercado crying on the floor of his kitchen with a loose cord around his neck and a kitchen knife placed up to, but not poking into, his chest. From a distance of about six feet away, Padilla twice shouted for Mercado to drop his knife, and then discharged the Sage Launcher, [4] hitting Mercado in the head from short range. Assuming that Padilla was aiming at Mercado's head intentionally, his use of force was clearly excessive.

*Mercado*, 407 F.3d at 1160–61. The facts of *Mercado* are materially distinguishable from this case. Mercado was not physically struggling with officers, resisting arrest, or attempting to take control of a weapon being held by a law enforcement officer. Further, no broad statement of principle from *Mercado* is readily applicable to this case, specifically because that holding was based on the third method of determining "fair warning" of a constitutional violation:

> this is one of the cases that lie "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Ferraro,* 284 F.3d at 1199 (internal quotation and citation omitted). The facts in this case are also "so far beyond the hazy border

---

[4] The Eleventh Circuit noted that:

The Sage Launcher is a "less lethal" munition that fires a polyurethane baton that is 1.5 inches wide, travels approximately 240 feet per second, and delivers a force of 154 foot/pounds of energy-approximately the energy of a professionally-thrown baseball. The Sage Launcher was designed to be used to protect persons from self-inflicted injury, especially when using a night stick or baton would be unsafe or impractical. The projectile is not designed to penetrate the body, but only to leave bruises.

*Mercado*, 407 F.3d at 1155.

between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Willingham,* 321 F.3d at 1303.

*Mercado*, 407 F.3d at 1160.

Turning to the facts in *Garner*, Edward Garner was a burglary suspect fleeing from officers in Memphis, Tennessee.

Garner, stopped at a 6-feet-high chain link fence at the edge of [a] yard. With the aid of a flashlight, [police officer] Hymon was able to see Garner's face and hands. He saw no sign of a weapon, and, though not certain, was "reasonably sure" and "figured" that Garner was unarmed. App. 41, 56; Record 219. He thought Garner was 17 or 18 years old and about 5′5″ or 5′7″ tall. While Garner was crouched at the base of the fence, Hymon called out "police, halt" and took a few steps toward him. Garner then began to climb over the fence. Convinced that if Garner made it over the fence he would elude capture, Hymon shot him. The bullet hit Garner in the back of the head. Garner was taken by ambulance to a hospital, where he died on the operating table.

*Garner*, 471 U.S. at 3–4 (footnotes omitted).  On those facts, the Supreme Court held:

Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.

It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the

suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11–12. Again, as in *Mercado*, Garner was not physically struggling with officers, actively resisting arrest, or attempting to and/or taking control of a weapon being held by a law enforcement officer. Further, Woodruff did not aim for or shoot Lawrence in the head as officers did in both *Garner* and *Mercado*.

*Mercado* and *Garner* are both factually distinguishable,[5] and the broad general principles announced in those cases are inapposite to this case. *See Garner*, 471 U.S. at 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."); *Mercado*, 407 F.3d at 1160 ("Officer Padilla should not have needed case law to

---

[5] Plaintiff appears to concede that *Garner* is factually distinguishable. "Though this is not a fleeing felon case, the law established in *Garner* provides an important frame of reference for consideration of plaintiff's claim." (Doc. 43 at 19). The Supreme Court has declined to expand the application of *Garner* beyond the fact-specific constraints of that decision. *See Scott v. Harris*, 550 U.S. 372, 382–83, 127 S. Ct. 1769, 1777, 167 L. Ed. 2d 686 (2007) ("*Garner* was simply an application of the Fourth Amendment's 'reasonableness' test, *Graham, supra,* at 388, 109 S.Ct. 1865, to the use of a particular type of force in a particular situation. *Garner* held that it was unreasonable to kill a 'young, slight, and unarmed burglary suspect, 471 U.S., at 21, 105 S.Ct. 1694, by shooting him 'in the back of the head' while he was running away on foot, *id.,* at 4, 105 S.Ct. 1694, and when the officer 'could not reasonably have believed that [the suspect] ... posed any threat,' and 'never attempted to justify his actions on any basis other than the need to prevent an escape,' *id.,* at 21, 105 S.Ct. 1694.").

know that by intentionally shooting Mercado in the head, he was violating Mercado's Fourth Amendment rights."). Although the facts of this case are tragic and disturbing, they are not so egregious as to present a violation of constitutional law in the absence of precedent. Lawrence was visibly and vocally resistant throughout the incident. His refusal to abide by the most basic of lawful commands from Woodward and Rhodes needlessly escalated the encounter from detention to arrest to a struggle that lasted longer than two minutes culminating in Lawrence having possession of the very weapon law enforcement had ineffectually used in the effort to subdue him and take him into custody without resort to deadly force. Even construing the evidence in the light most favorable to the Plaintiff, the video evidence inescapably demonstrates that Woodruff had probable cause to believe that Lawrence, in possession of the Taser, posed a serious threat of physical harm to herself, Rhodes, and Skipper.

> Again, we must look at the situation not with hindsight, but with the eye of the objectively reasonable officer on the scene. From the scene, we have a man who for a considerable time has consistently put his life and the lives of others in danger and who has shown that he has every intention of fighting and forcibly escaping arrest if possible. We cannot say the defendants' acts were beyond the outside borders of objective reasonableness given all the circumstances.

*Garrett v. Athens-Clarke Cty., Ga.*, 378 F.3d 1274, 1281 (11th Cir. 2004).

The Supreme Court recently held in favor of qualified immunity for a police officer a case in which a suspect who had engaged in erratic behavior "was armed

with a large knife; was within striking distance of [a bystander]; ignored the officers' orders to drop the weapon; and the situation unfolded in less than a minute. *Kisela v. Hughes*, 138 S. Ct. 1148, 1154, 200 L. Ed. 2d 449 (2018).   In this case, Lawrence displayed agitated, confrontational behavior, armed himself by taking possession of an officer's weapon, was within striking distance to two officers, had ignored almost every command leading up to that moment, and the situation unfolded in a very brief period of time.   Woodruff reasonably believed, even if perhaps mistakenly, that Lawrence was an immediate threat to others.

> Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard,* 572 U.S. ——, ——, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014).

*Kisela*, 138 S. Ct. at 1153, 200 L. Ed. 2d 449 (2018).   In this case, a reasonable officer, confronted with a physically and verbally resistant arrestee who had managed to take control over an officer's weapon in the course of an ongoing struggle with those officers, could have reasonably believed that Lawrence presented an immediate threat of serious physical harm to her and the other officers present. There is no sufficiently definite existing precedent that squarely governs the specific facts at issue.   Accordingly, Woodruff is entitled to qualified immunity.

## 2. Count II – State Law Claims

In the Complaint, Plaintiff alleged a state law claim of "Assault and Battery/Excessive Force," specifically arguing that "Woodruff shot and killed Lawrence … in violation of clear City policy regarding when deadly force is permissible." (Doc. 1 at ¶¶ 71-72). In her motion for summary judgment, Woodruff argues that she is "entitled to peace officer/state agent immunity under § 6-5-338(a), Ala. Code 1975 and *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)." (Doc. 64 at 53). Plaintiff also moved for summary judgment as to Count II of the Complaint. (Doc. 43 at 28)("[T]his Court should grant plaintiff's motion and enter judgment for plaintiff as to liability regarding plaintiff's excessive force claim against defendant Woodruff."). In response to Woodruff's invocation of state agent and peace officer immunity, Plaintiff argues that Woodruff is not entitled to immunity because "a reasonable jury can conclude that Woodruff lacked arguable reasonable suspicion for a *Terry* stop and that Woodruff used excessive force on Lawrence, in violation of U.S. Constitution and § 1983. A reasonable jury can also conclude, therefore, that Woodruff acted contrary to the Constitution and also willfully, maliciously, in bad faith, and beyond her authority." (Doc. 70 at 50). Plaintiff raised no other argument in reference to peace officer or state agent immunity in any brief or objection before this Court.

Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in

executing their work responsibilities." *Ex parte Hayles,* 852 So.2d 117, 122 (Ala.2002). In *Ex parte Cranman,* 792 So.2d 392 (Ala.2000), a plurality of the Alabama Supreme Court restated and clarified the scope of Alabama's state-agent immunity doctrine, which bars suit against law enforcement officers effecting arrests, except to the extent the officer acted willfully, maliciously, fraudulently, in bad faith, beyond his legal authority, or under a mistaken interpretation of law, or if the Constitution or laws of the United States or Alabama require otherwise. *Id.* at 405.

There is also statutory, discretionary-function immunity in Alabama. Specifically, § 6–5–338 of the Alabama Code contains a provision immunizing law enforcement officers from tort liability for conduct within the scope of their discretionary law enforcement duties. Ala. Code § 6–5–338(a) (1994) ("Every peace officer ... shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."). *Cranman*'s test for state-agent immunity governs whether law enforcement officers are entitled to statutory, discretionary-function immunity under § 6–5–338(a). *Ex parte City of Tuskegee,* 932 So. 2d 895, 904 (Ala. 2005) ("The restatement of State-agent immunity as set out in *Cranman,* 792 So. 2d at 405, now governs the determination of whether a peace officer is entitled to immunity under § 6–5–338(a)."). So for our purposes, the question of whether … police officers … receive immunity for Plaintiffs' state-law claims depends on application of *Cranman*'s state-agent immunity test.

The Alabama Supreme Court established a burden-shifting framework for application of the state-agent immunity test. A defendant initially bears the burden of demonstrating that he was acting in a function that would entitle the agent to immunity. *Ex parte Estate of Reynolds,* 946 So.2d 450, 452 (Ala. 2006). "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id.*

*Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740–41 (11th Cir. 2010).

Turning to Plaintiff's claim against Woodruff, Plaintiff appears to dispute that Woodruff was acting within the scope of her discretionary functions as law enforcement officer because, he argues, "a reasonable jury can conclude that Woodruff lacked arguable reasonable suspicion for a *Terry* stop and that Woodruff used excessive force on Lawrence, in violation of U.S. Constitution and § 1983." (Doc. 70 at 50). However, Plaintiff's argument is inconsistent with his earlier statement in his Motion for Partial Summary Judgment that "[i]n qualified immunity analysis, once a public official has shown he or she was acting within the scope of his or his discretionary authority, *which defendant has here*, the burden shifts to the plaintiff to show the official's conduct violated clearly established law." (Doc. 43 at 21)(emphasis added).

> The Alabama Supreme Court has applied the same "arguable probable cause" standard utilized in this Court's federal qualified immunity cases for determining whether a city police officer receives state-agent immunity for his role in an arrest. *Borders v. City of Huntsville,* 875 So.2d 1168, 1180 (Ala.2003) ("If ... a jury question exists as to whether [the officer] acted with arguable probable cause, [then] the summary judgment [to the officer] must be reversed.").

*Brown*, 608 F.3d at 741. Regardless of Plaintiff's conflicting arguments regarding discretionary function, as discussed above Woodruff is entitled to receive qualified immunity for her conduct in arresting Lawrence because the facts, construed in the light most favorable to the Plaintiff, show that Woodruff had probable cause to arrest

Lawrence. That same analysis applies to determining whether Woodruff receives state-agent immunity for her role in the arrest. Plaintiff thus bears the burden of showing that Woodruff acted willfully, maliciously, fraudulently, in bad faith, beyond her legal authority, or under a mistaken interpretation of the law.

As to Plaintiff's state law claim of assault and battery/excessive force, he has not carried his burden to show facts supporting willful, malicious, fraudulent, bad faith, or legally unauthorized actions by Woodruff against Lawrence. As noted above, Plaintiff's entire argument as to this issue is that "a reasonable jury can also conclude, therefore, that Woodruff acted contrary to the Constitution and also willfully, maliciously, in bad faith, and beyond her authority." (Doc. 70 at 50). Plaintiff has argued a bare, unadorned legal conclusion that is simply insufficient to meet this burden. Woodruff's "use of force against [Lawrence] does not constitute a constitutional violation, and neither does it show the required willfulness, maliciousness, fraud, or bad faith necessary to deny [Woodruff] state-agent and statutory, discretionary-function immunity." *Brown*, 608 F.3d at 742. Accordingly, Woodruff's motion for summary judgment as to Count II of the Complaint is due to be granted.

V.    **CONCLUSION**

After an independent and de novo review of the record, the court concludes that the magistrate judge's recommendation should be adopted in part and rejected in part. Accordingly and for the reasons herein stated, it is

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 43) be and is **DENIED**. It is further

**ORDERED** that Defendants' City of Dothan, Alabama, Benton, and Summerlin's Motion for Summary Judgment (Doc. 63) be and is **GRANTED**. It is further

**ORDERED** that Defendant Woodruff's objection (Doc. 77) is **SUSTAINED** and that her Motion for Summary Judgment (Doc. 63) be and is **GRANTED.**

A final judgment will be entered separately.

**DONE** and **ORDERED** this 8th day of November 2018.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE